## Burchett v. Commonwealth.

(Decided Jan. 20, 1933.)

22

WALTER S. HARKINS, JAMES & HOBSON, and JOSEPH D. HARKINS for appellant.

BAILEY P. WOOTTON, Attorney General, and C. P. STEPHENS, Commonwealth's Attorney, of Prestonsburg, for the Commonwealth.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

In December, 1931, at the January term of the Floyd circuit court, the appellant, Bertha Burchett, and her husband, Larce Burchett, were jointly indicted by the grand jury of Floyd circuit court on a charge of the willful murder of Belle Thompson.

To this indictment, the defendants entered a plea of not guilty and offered a demurrer thereto, which was overruled.

Upon the first trial of the case in January, 1932, the jury was unable to agree on a verdict and was discharged.

Upon its second trial in April, 1932, the court, at the conclusion of all the evidence, sustained a motion for a peremptory instruction as to the defendant Larce Burchett, upon which the jury returned its verdict finding him not guilty. Further, the jury, after hearing the evidence, instructions of the court, and argument of counsel, returned a verdict finding the appellant, Bertha Burchett, guilty of voluntary manslaughter and fixing her punishment at confinement in the penitentiary for a period of seven years.

Her motion and grounds for a new trial being overruled, she prosecutes this appeal, seeking a reversal of the judgment upon the sole ground that the court committed a reversible error in failing to instruct the jury on involuntary manslaughter and reckless use of firearms.

The facts shown by the record are that the appellant, Bertha Burchett, her husband, Larce Burchett,

and her mother, the deceased Belle Thompson, all lived together at the time of the killing on a farm in Floyd county, jointly owned by the deceased and her son-in-law, Larce Burchett; that in the summer of 1931, some difference arose between the deceased and Larce Burchett in connection with the control or management of the farm, resulting in a strained and unfriendly relationship between them, when they stopped speaking to each other and causing the deceased to stop eating her meals with the family, and, it is shown, she afterwards lived alone in an upstairs room of the house, there doing all her household work and preparing her own meals upon an open grate, despite the fact that she was then almost blind and had to grope her way about by feeling; that due to this difference arising between the defendant son-in-law, Larce Burchett, and the now deceased Belle Thompson, she, but a short while before being killed, instituted her suit in the Floyd circuit court, seeking a division of this farm upon which they were living, which had been jointly bought by and was owned by her and her son-in-law, Larce Burchett. It is the theory of the commonwealth that the appellant and her husband, Larce Burchett, were opposed to this suit for division of the farm, and that they killed her for the purpose of ending the litigation she had started therefor.

The evidence, however, is to the effect that the appellant did not become involved in this land controversy between her mother and husband, but continued to be on friendly terms and speaking relations with her, though there is some evidence that she, as well as her husband, Larce Burchett, did not "get along" with her nor "speak friendly" to her.

The facts and circumstances leading up to and attending the killing of Belle Thompson are in substance, briefly stated, as follows: The appellant, Bertha Burchett, states that on the morning of September 15, 1931, her mother, Mrs. Thompson, was looking for a letter which she stated she had received from "Pony" Thompson, who was then confined in the state penitentiary; that being unable to find this letter, she accused appellant of having it and became very angry with her when she denied having the letter and left the house, stating she was going to town, when appellant followed her and persuaded her, because she was mad, to return;

upon her return, she again accused the appellant of having the letter, and said, "If you don't give it to me, I will kill you" and went upstairs to her room, returning in a few minutes with a butcher knife to the kitchen, where appellant was then standing, when she said, "You just as well get the letter for I mean to have it," and grabbed appellant by the hair of her head and commenced choking her and cutting at her with the knife, making several minor cuts upon her hands and body, when appellant succeeded in taking the butcher knife from her; that during the scuffle for the possession of the knife wielded by her mother, she got loose from her several times, when her mother would grab her again. When asked why, when she got loose from her mother, she didn't walk out of the kitchen and leave her, appellant answered, "I didn't want to," that she couldn't get away from her on the outside, as her mother could follow her. When asked why she didn't go where Larce, her husband was, she said, "I didn't think of it, I was excited." Appellant further stated that when she finally took the butcher knife from her mother, that her mother instantly discovered the gun lying upon the pie counter, close to which appellant was then standing. As to this she testifies, saying:

"I saw she had discovered the gun. I grabbed for the gun about the same time she did and both got hold of it and scuffled around and the gun went off."

"Q. Did she get hold of the pistol first or you? A. She got hold of it first.

"Q. Did she present it on you? A. I grabbed about the same time she did, grabbed her arm.

"Q. Didn't your mother see the pistol and start towards it, and you beat her to it? A. Both grabbed about the same time.

"Q. Both started for it. A. Standing there reaching towards it.

"Q. How long did you wrangle over the pistol with the gun over your heads before the shot fired? A. I don't know.

"Q. Do you know in what position the gun was when it fired? A. We had it over our heads.

"Q. Do you know which one had hold of the trigger? A. No I do not.

"Q. Bertha did you intend to kill your mother? A. No sir.

"Q. Did you fire that pistol intentionally? A. No sir.

"Q. Do you know whether you fired it or not? A. No sir."

Epp Lafferty and W. A. Dingus, testifying for the commonwealth, said that on the morning in which appellant's mother was killed, Bertha Burchett, after voluntarily surrendering herself for arrest, told them that she and her mother had gotten into a quarrel over a letter; that her mother believed that she had the letter her mother had received from "Pony," her son, and was keeping it; that her mother went upstairs and got a butcher knife and came back down and got her by the hair of her head and commenced cutting her with the butcher knife; and that she shot her.

It is shown that the shot which killed Belle Thompson, appellant's mother, "went through the top of her right breast, ranged down and out the lower side of her breast, entered the body under the right nipple * * * ; it come out in the left side of the back about one and one-half inches above the hip bone, it ranged down from the point of entrance."

It is further testified by other witnesses for the commonwealth, Lizzie Pelfry and Laura Dillon, that just before the killing of Belle Thompson, they were standing nearby across the river, opposite the rear of the Burchett home, when they heard the appellant and her mother fussing on their back porch, near the river, and saw the appellant shove the deceased through the door into the kitchen, shortly after which they heard a shot fired in the house, followed by screaming, a man's cursing, and another shot quickly following.

Upon the conclusion of all the evidence, the court gave six instructions. The first covered the issue of willful murder; the second covered that of voluntary manslaughter; by the third, the jury were told that should they find the defendant guilty, "but have a reasonable doubt from the evidence as to whether she is guilty of willful murder, * * * or guilty of voluntary manslaughter, * * * you will find her guilty of voluntary manslaughter"; the fourth submitted the issue of self-

defense; the fifth, as required by the facts of the case, the issue of accidental killing; the sixth reads:

"If the jury believe and find from the evidence, that the shot which wounded and killed the deceased, Belle Thompson, was accidentally fired without any intention on the part of the defendant, Bertha Burchett, to shoot said Thompson, then in that event you ought to acquit the defendant, and the jury should find her not guilty."

Appellant contends that the court most prejudicially erred through its failure and refusal to give instructions covering the whole law of the case, by failing to give an instruction upon involuntary manslaughter and reckless use of firearms.

Appellant rests her appeal upon this one assignment of error, which alone is argued by her counsel in brief, that the court, in failing to give this one requested instruction, committed reversible error.

The evidence as hereinabove recited shows that appellant's defense to the murder charge against her is that her mother, the deceased Belle Thompson, was accidentally and unintentionally shot while she and the appellant were struggling for the possession of this pistol, when held by the deceased while trying to shoot and kill her therewith.

This court, in the case of Crum v. Commonwealth, 196 Ky. 802, 245 S. W. 501, relied on by appellant in support of her claim for the requested instructions, said:

"From the short statement of the * * * evidence above, it is evident that appellant relied chiefly upon the law of accidental killing or unintentional killing, or the negligent use of firearms as his defense, and the proof he introduced tends strongly to support one or more of these defenses. This being true, it was the plain duty of the trial court to have given an instruction upon the law of accidental and unintentional killing and involuntary manslaughter, as well as one on the reckless use of firearms."

Also, in the case of Smith v. Commonwealth, 133 Ky. 532, 118 S. W. 368, 370, this court directed the giving of this instruction prepared by it:

"If, however, they should believe from the evidence, beyond a reasonable doubt that defendant

shot and killed deceased with a gun, and that such shooting and death of deceased resulted from the unintentional and careless discharge of the gun by him in doing an unlawful act, such as struggling with deceased to retain the gun for the purpose of shooting John Polk, if he was so struggling for the possession of the gun for such purpose, when deceased was trying to prevent him from shooting said Polk, if he was so trying, they should in that event find defendant guilty of involuntary manslaughter, and fix his punishment at a fine in any amount, or imprisonment in jail any length of time in the discretion of the jury. If the jury believe from the evidence that the killing of deceased by defendant was not murder, voluntary or involuntary manslaughter, as defined in the instructions, but was unintentional and accidental, they should acquit him.''

In Long v. Commonwealth (Ky.) 112 S. W. 841, 842, where defendant's defense was that the killing was due to the accidental discharge of a pistol, and the court had refused to give the requested instruction on involuntary manslaughter and accidental killing, this court again said:

''There was some evidence offered which tended to show that from statements made by appellant before and after the killing the shooting was not accidental, but was intentional, while, on the other hand, he testifies positively and directly that it was an accident, pure and simple. Under this state of case he was entitled to have his defense presented to the jury by appropriate instructions, and the court erred in failing and refusing to instruct the jury on the subject of involuntary manslaughter and accidental shooting. Blanton v. Commonwealth, 103 S. W. 329, 31 Ky. Law Rep. 800.''

It may be conceded that a defendant in a homicide case is entitled to an instruction applicable to every state of case deducible from the evidence.

Appellant contends by counsel, that according to her theory of the case, which is deducible from her evidence, her offense was one of unintentional killing or involuntary manslaughter. ''Involuntary manslaughter'' is defined as ''the killing of another in doing

some unlawful act, without intention to kill," and "the killing constitutes involuntary manslaughter where due to the careless use of firearms and there is not reckless or gross carelessness"; also, the killing is accidental when the shot is not careless, and not unlawful. Ewing v. Commonwealth, 129 Ky. 237, 111 S. W. 352, 33 Ky. Law Rep. 749; Lewis v. Commonwealth, 140 Ky. 652, 131 S. W. 517; Hawkins v. Commonwealth, 142 Ky. 188, 133 S. W. 1151; Hunn v. Commonwealth, 143 Ky. 143, 136 S. W. 144.

Again in the case of Peal v. Commonwealth, 235 Ky. 356, 31 S. W. (2d) 602, this court, in considering the question of when an instruction upon involuntary manslaughter was required to be given upon a defense based upon evidence tending to show an unintentional killing or shooting, said:

"The principal ground urged for reversal is that the court erred in failing to instruct on involuntary manslaughter. In the case of Lewis v. Commonwealth, 140 Ky. 652, 131 S. W. 517, 519, the precise question was involved. Lewis was an officer, and Puckett was fleeing from him. He testified that he did not intend to shoot Puckett, that he fired over his head, and that he stumbled and his gun wabbled, and he shot him accidentally. In holding that the accused was entitled to an instruction on involuntary manslaughter the court said: 'If the officer undertook to shoot over Puckett's head, and had reason to know that to shoot as he did would endanger his life, and fired the pistol recklessly and without malice, he is guilty of voluntary manslaughter; for the law for the protection of life puts the risk on him who willfully and recklessly does the act endangering it. But if he did not intend to shoot at Puckett at all, and the pistol was discharged involuntarily by reason of his stumbling, then the act would be an accident, if the officer was not negligent in carrying the pistol as he did. If he did not exercise reasonable care in handling his pistol, and from this cause fired the shot, he was guilty of involuntary manslaughter, though he did not intentionally fire the shot that killed Puckett.' In Clem v. Commonwealth, 198 Ky. 486, 248 S. W. 1036, the court announced the same rule, and held that, where there was evidence that defendant,

an officer, did not intend to shoot an escaping prisoner, but the jury might have found that he did not exercise reasonable care in handling his weapon, an instruction on involuntary manslaughter was proper.''

And to like effect, see Smiley v. Commonwealth, 235 Ky. 735, 32 S. W. (2d) 51; Hatfield v. Commonwealth, 230 Ky. 630, 20 S. W. (2d) 461; Romans v. Commonwealth, 231 Ky. 487, 21 S. W. (2d) 797; Eastridge v. Commonwealth, 195 Ky. 126, 241 S. W. 806; Lewis v. Commonwealth, 140 Ky. 652, 131 S. W. 517, 519; Long v. Commonwealth (Ky.) 112 S. W. 841; Smith v. Commonwealth, 133 Ky. 532, 118 S. W. 368; Blanton v. Commonwealth, 103 S. W. 329, 31 Ky. Law Rep. 800.

It will be noted that in the Lewis Case, supra, from which we quoted, the court said:

''If he did not exercise reasonable care in handling his pistol, and from this cause fired the shot, he was guilty of involuntary manslaughter, though he did not intentionally fire the shot that killed Puckett.''

From these cases the rule is deducible that, to entitle the defendant to an instruction on involuntary manslaughter, there must have been an unintentional killing by the person while engaged in or doing some unlawful act, and that the accidental killing should have occurred while struggling for possession of the gun for carrying out such purpose.

In the instant case, the appellant's testimony as to the claimed accidental killing, upon which she claims she should have been given the involuntary manslaughter and negligent use of firearms instructions, does not evidence or tend to show that when she was struggling with her mother for the possession of the gun she was engaged upon an unlawful act or trying to get it for the purpose of doing an unlawful act therewith, but only that she was attempting to take it from her mother to prevent her mother from carrying out her threatened purpose or declared intention of shooting her therewith. Certainly, when one is engaged in the desperate effort of recovering a gun from an assailant then threatening to take his life therewith, he is not chargeable with any ordinary or other degree of

care as to the manner of his struggle, made under such circumstance of danger, to secure possession of the deadly weapon; nor where, as in the instant case, the gun, appellant states, was in the possession of her assailant, rather than her own, should any question arise as to her careless or reckless handling of the gun, while struggling for it, resulting in the killing of another, upon which should be based an instruction as to the careless, negligent, or reckless use of firearms.

In the Crum Case, supra, relied on by appellant, and those hereinabove by us quoted and cited, as setting forth the rule requiring the giving of the requested involuntary manslaughter and reckless or negligent use of firearms instructions, as here contended for, the facts upon which the defendant asked for an involuntary manslaughter instruction, tended to show that the killing was unintentional, and further tended to show that the accused was then, at the time of such unintentional killing, through the alleged accidental discharge or firing of his gun, then engaged in doing some unlawful act; or again, where the reckless use of firearms instruction was asked, that the accused was in possession of the deadly weapon, which was unintentionally fired, killing another, through his careless or reckless handling of it, while engaged in a struggle for its possession.

Appellant's evidence in the instant case was that her mother, the deceased Belle Thompson, was killed by the accidental discharge of the gun, and without intention on appellant's part to shoot her therewith, while struggling with her mother for the possession of the gun, with which she was then threatening appellant's destruction.

We are of the opinion that the court covered this phase of the evidence or claimed defense, based upon appellant's version of the killing, by its instruction No. 5 on accidental killing, which directed the jury to acquit her of her charged offense, should it accept and believe appellant's account of the killing as unintentional.

We are further of the opinion that the court did not err in failing to give the requested instruction on the reckless or negligent use of firearms, as there is here no evidence as to appellant's having had possession or control of the gun when fired, so that she could

have carelessly or recklessly used it so as to have thereby caused her mother's death. The evidence, on the contrary, is that the gun throughout the struggle for its possession, in which she was killed, was in decedent's possession.

We conclude, for the reasons stated, that the instructions of the trial court as given covered the whole law of the case, from which it follows that it did not err in refusing to give the further instructions requested by appellant. Therefore, perceiving no error prejudicial to appellant's substantial rights, the judgment is affirmed.